

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 2738 | **DATE** | 5/6/2004 |
| **CASE TITLE** | ITQ Lata, LLC vs. MB Financial Bank, N.A. | | |

**MOTION:**  [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due ____ __.

(3)  ☐  Answer brief to motion due _____. Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for ____ at _____ .

(5)  ☐  Status hearing[held/continued to] [set for/re-set for] on __ ____ set for _ ____ at ____ __.

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at __ ____.

(7)  ☐  Trial[set for/re-set for] on ___ ___ at _____ .

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to __ ____ at ____ __.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]  Enter Memorandum Opinion and Order. Judgment is hereby entered in favor of Plaintiff ITQ Lata, LLC, and against Defendant MB Financial Bank, N.A. in the total amount of $78,517.86 for all invoices under Count I (breach of contract) and in the total amount of $12,736.08 for two monthly advance invoices numbered 2689 ($5,000.00) and 2740 ($7,000.00) plus interest ($736.08) under Count II (account stated) of its amended complaint. The judgment under Count II is not in addition to the judgment under Count I. Judgment is hereby entered in favor of Defendant MB Financial Bank, N.A., and against Plaintiff ITQ Lata, LLC, on Count III (unjust enrichment) of Plaintiff's amended complaint. Plaintiff, as the prevailing party, is entitled to recover its court costs against Defendant.

(11)  ■  [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | MAY 1 0 2004 | | 19 |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 5/6/2004 | | |
| | | | date mailed notice | | |
| DK | courtroom deputy's initials | | DK | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ITQ LATA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 03 C 2738** |
| | ) | |
| MB FINANCIAL BANK, N.A. | ) | **Magistrate Judge Morton Denlow** |
| | ) | |
| Defendant. | ) | |

**DOCKETED**
**MAY 10 2004**

## <u>MEMORANDUM OPINION AND ORDER</u>

This case involves a $110,156.57 claim for breach of contract, account stated, and unjust enrichment brought by Plaintiff ITQ Lata, LLC ("Plaintiff" or "ITQ"), against Defendant MB Financial Bank, N.A. ("Defendant" or "MB"), arising out of public relations services performed during the year 2002. The Court conducted a bench trial on March 8-9, 2004. The Court has considered carefully the testimony of the five witnesses who testified at the trial, the parties' trial exhibits, the parties' written submissions, and the excellent closing arguments.

The following constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain findings may be deemed conclusions of law, they shall also be considered conclusions of law. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings of fact.

19

# I. ISSUES PRESENTED

1.      Was the monthly advance a cap on the fees that could be charged for base media services?  ANSWER: No.

2.      How much is still owed by MB to ITQ for public relations services in 2002?  ANSWER: $78,517.86, including interest.

3.      Is MB liable to ITQ for services performed in connection with MB's 2001 annual report?  ANSWER: No.

# II. FINDINGS OF FACT

## A.      THE PARTIES

1.      ITQ is a limited liability corporation organized under the laws of the State of New Mexico, with its principal place of business in Albuquerque, New Mexico and offices in Denver, Colorado and Chicago, Illinois.  ITQ is duly authorized to do business in the State of Illinois, and it specializes in information technology.  It is wholly owned by Los Alamos Technical Associates, Inc. ("LATA"), a New Mexico corporation with its principal place of business in Alburquerque, New Mexico.  Robert Kingsbury currently is the sole officer of ITQ and is one of the three managers of that company.  He is also President of LATA. During 2002, ITQ had a public relations and marketing division, known as ITQ Minkus & Dunne, operating in Chicago. ITQ Minkus & Dunne provided public relations and marketing services for MB, which are at the center of this dispute.

2. MB is a nationally chartered bank with its principal place of business in Chicago, Illinois. At all times pertinent to this case, Karen Perlman was Vice President and Director of Marketing for MB.

## B. THE RELATIONSHIPS AMONG THE KEY ACTORS

3. Raymond Minkus co-founded an independent firm known as Minkus & Dunne, which specialized in providing public relations and marketing services. On or about December 1, 1999, Raymond Minkus, on behalf of Minkus & Dunne, and Karen Perlman, on behalf of MB, entered into a written contract (the "Agreement") calling for Minkus & Dunne to provide certain public relations and marketing services to MB. Px 13. Within weeks of entering into the Agreement with MB, Minkus & Dunne became the public relations and marketing services division of ITQ. Raymond Minkus became the head of the Chicago office of the newly formed division, ITQ Minkus & Dunne.

4. After the creation of ITQ Minkus & Dunne, the Agreement remained intact. For their respective companies, Raymond Minkus and Karen Perlman supervised the public relations and marketing activities under the Agreement. Karen Perlman was the sole authority at MB to approve or reject invoices from ITQ. Raymond Minkus was responsible for the preparation and approval of all of the invoices sent to MB.

5. In order to prepare for important announcements, Perlman trusted Minkus with confidential information regarding mergers and acquisitions. Raymond Minkus performed work for Karen Perlman with respect to those confidential mergers and acquisitions.

3

6.     Under the direction of Raymond Minkus, ITQ Minkus & Dunne maintained an excellent relationship with MB during the years 2000 and 2001. During those years, Perlman remained within her marketing budget, and there were no disputes over charges for services provided by ITQ to MB in 2000 and 2001, except for services in December, 2001. Dx 19. Between early 2001 and mid-2002, MB publicly announced the following mergers and acquisitions:

- On February 9, 2001, MB made public its acquisition of First Savings & Loan of South Holland.

- On April 20, 2001, MB made public its merger with Mid City Bank.

- On December 3, 2001, MB made public its renaming after the Mid City Bank merger.

- On December 27, 2001, MB made public its merger with Lincolnwood Bank.

- On July 22, 2002, MB made public its merger with LaSalle Leasing.

7.     By mid-2002, Perlman's budget became constrained and Minkus's relationship with ITQ simultaneously began to sour. Beginning in mid-to-late 2002, business relationships between Minkus, ITQ, and MB began to unravel. Perlman began to refuse to pay the full amount of invoices from ITQ as her budget became strained. Minkus attempted to reconcile the invoices and to obtain payment. Px 25. He was only partially successful. Px 27. Minkus ultimately resigned from ITQ, communicating his decision by a letter dated

4

December 5, 2002. He subsequently filed a complaint in the Northern District of Illinois against ITQ and individual current and former employees, officers, and directors of ITQ and its parent company. Dx 4. ITQ then filed a counterclaim against Minkus. That litigation was still pending at the time of trial.

8.     Shortly after Raymond Minkus resigned from ITQ, Karen Perlman terminated the Agreement between MB and ITQ by letter dated December 18, 2002. Px 43. On January 31, 2003, Raymond Minkus, on behalf of the newly-formed Minkus & Pearlman Public Relations, Inc., contracted with Karen Perlman, on behalf of MB, to provide the same services that Minkus & Dunne had provided to MB when it was a division of ITQ. Px 44.

## C.   THE AGREEMENT

9.     The December 1, 1999 Agreement called for certain public relations and marketing services to be provided to MB. Px 13. The parties continued to operate under the terms of the Agreement, with one material oral modification, until the termination of MB's relationship with ITQ in December 2002. The Agreement stated that ITQ Minkus & Dunne would be:

> responsible for providing media relations and other communications services. When projects are initiated, all parameters will be discussed, budgeted and agreed upon before any services are performed, with the exception of "as needed" consulting services as long as it pre-disclosed that those services are in addition to the monthly advance invoice or other pre-approved projects.

Professional time is based upon the personal effort required to perform on [MB's] behalf and includes client and internal meetings, all forms of written and oral communications, media and supplier contact.

Px 13, at 6.

10.     The Agreement also provided, in relevant part entitled "INVOICING

STRUCTURE," that, beginning January 1, 2000, MB would:

make a monthly commitment of a $5,000 advance *towards* funding the base media relations program during the next twelve months. Core public and media relations activities will be accounted for monthly with the *balance* fees *beyond the advance* to be invoiced at the end of each month. Advance payments are due the 1st of the month in which services are rendered.

Out of pocket charges and expenses are additional. . . .

Any project work in excess of the above monthly fee will be performed only upon approval. Fees for all additional assignments and expenses will be budgeted and invoiced separately and are due upon receipt. Questions regarding any invoices must be brought to our [ITQ's] attention within seven days of receipt.

Px 13, at 7 (italicized emphasis added; underlining in original). Pursuant to a material oral

modification by Minkus and Perlman, this section was amended to increase the amount of

the monthly advance paid to ITQ by MB from $5,000.00 per month to $7,000.00 per month

effective in the Spring of 2002.

11.     The services referred to as the base media relations program and core public

and media relations activities that were provided by ITQ included services described

in ITQ's invoices as "General Media Relations," "Communications Planning," "Media List

6

Development," "Media Monitoring," "Strategic Planning," and "Press Releases." *See, e.g.*, Pl. Ex. 10. MB paid for these services out of its marketing budget.

12.     The services referred to as project work in this case include those services related to MB's mergers and acquisitions. MB had special project funds, separate and apart from its marketing budget, from which fees for project work were paid.

13.     The invoicing provisions of the Agreement were not strictly followed by the parties. Invoices were not always sent at the end of each month. MB did not always object to invoices within seven days of receipt. At times, the parties chose not to invoice base work and project work separately. The parties' failure to strictly adhere to the Agreement is the genesis of the disputes arising in this case and arises out of the excellent working relationship that existed between Minkus and Perlman in 2000 and 2001.

14.     In 2001, fees for both "project work" and for base or core media or public relations services appear on the face of the invoices. *See e.g.*, Px 16. The advance of $5,000.00 was invoiced separately and was applied against the monthly invoice. There is no indication, however, as to what extent the advance was being applied to "project work" or to base or core media or public relations services. Px 16.

15.     The disputes arising in this case in 2002 caused Karen Perlman ultimately to object to several invoices because she believed they included fees for unauthorized base media service work as well as fees for an incomplete media kit, excessive work on a one-day

project involving Ralph Bloch, and work on MB's 2001 annual report that MB had contracted Grady Campbell, Inc., to perform.

16.     In September 2002, Raymond Minkus attempted to reconcile the disputes, sending memoranda dated September 11, 2002, to Karen Perlman to explain that "with the volume of activity relating to special projects, there may have been several instances where charges were miscoded on [ITQ's] end," resulting in outstanding invoices from as far back as December 2001. Px 25. Minkus subsequently corrected several invoices, allocating amounts to special projects, which resulted in a payment from MB to ITQ of $49,963.75 on October 10, 2002. Px 27.

17.     On December 17, 2002, and December 31, 2002, after he resigned from ITQ, Raymond Minkus met with Sandra Rezny, Perlman's marketing coordinator, in an attempt to adjust properly the disputed invoices. The meetings did not result in additional payments.

18.     In the meantime, when Karen Perlman terminated the Agreement via a December 18, 2002 letter to Robert Kingsbury, she requested that a recap for services provided in December be sent to Sandra Rezny and that ITQ return all files and work product. Px 43. Perlman did not express any dissatisfaction with the services performed by ITQ. Kingsbury replied with an email and a letter dated December 19, 2002, acknowledging and accepting the termination of service, canceling the December 2002 advance invoice, promising to send an invoice for hours worked in December, and agreeing to return all files

8

and work product to MB only upon receipt of $94,638.81 past due from seven invoices dating back to January 2002. Px 51.

19. On January 20, 2003, Kingsbury sent to Karen Perlman an email stating that ITQ had not had any communication from MB regarding the unpaid invoices since January 7, 2003, and he request a personal meeting with Perlman. Px 52. On January 23, 2003, Kingsbury sent a spreadsheet to Sandra Rezny listing all invoices since January 2001 and stating that there were no more invoices in ITQ's system. Dx 9. He also informed MB that Raymond Minkus no longer had authority on behalf of ITQ to discuss the disputed invoices. Finally, on February 10, 2003, Kingsbury sent another email to Perlman expressing his concern that ten invoices remained unpaid for a total amount past due of $137,028.32. Px 53.

20. On February 18, 2003, MB issued a check to ITQ in the amount of $47,938.00 for work performed by ITQ in 2002. Px 30. This lawsuit was filed to resolve the dispute over the unpaid fees.

### III. CONCLUSIONS OF LAW

**A. JURISDICTION**

21. This Court has diversity jurisdiction. 28 U.S.C. § 1332(a)(1). In a diversity action, a federal court applies the substantive law of the forum state. *Alper v. Altheimer & Gray*, 257 F.3d 680, 687 (7th Cir. 2000). In this case, the substantive law of Illinois applies.

## B.     BREACH OF CONTRACT CLAIM

22.     Under Illinois law, a breach of contract claim has four elements: (1) the existence of a valid and enforceable contract; (2) the plaintiff's performance of all of its contractual obligations; (3) the defendant breached the contract; and (4) the resulting damages to the plaintiff. *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001); *Finch v. Ill. Cmty. College Bd.*, 734 N.E.2d 106, 110 (Ill. App. Ct. 2000). The starting point of any contract analysis is the language of the contract. *MJ & Partners Restaurant Ltd. P'ship v. Zadikoff*, 995 F. Supp. 929, 931 (N.D. Ill. 1998). The contract as a whole must be considered and the intent of the parties must be determined. *Finch*, 734 N.E.2d at 110. If a contract is clear and unambiguous, the intent of the parties is derived from the plain language of the contract, without resorting to extrinsic evidence outside the "four corners" of the document. *Zadikoff*, 995 F. Supp. at 931. Whether an agreement is ambiguous is a question of law. *In re Marriage of Wenc*, 689 N.E.2d 424, 427 (Ill. App. Ct. 1998). A clear and explicit agreement must be enforced as written. *Rakowski v. Lucente*, 472 N.E.2d 791, 794 (Ill. 1984).

23.     Any ambiguity in a contract must be resolved against the drafter. *Guerrant v. Roth*, 777 N.E.2d 499, 503 (Ill. App. Ct. 2002). If contract language is ambiguous or capable of more than one interpretation, then parol evidence is admissible to determine the parties' intent. *Pepper Constr. Co. v. Transcontinental Ins. Co.*, 673 N.E.2d 1128, 1130 (Ill. App. Ct. 1996). The interpretation of an ambiguous contract is reserved for the finder of fact. *Id.*

10

24.     When a contract is susceptible to two conflicting constructions, the implied duty of good faith and fair dealing is used as an aid to determine the intent of the parties, unless that duty is expressly disavowed. *Citicorp Savings of Ill. v. Rucker*, 692 N.E.2d 1319, 1324 (Ill. App. Ct. 1998). The duty of good faith and fair dealing requires that contractual discretion be exercised reasonably and with proper motive, and not arbitrarily and capriciously. *Zadikoff*, 995 F. Supp. at 932; *Rucker*, 692 N.E.2d at 1324. This duty is viewed in reference to the parties' reasonable expectations at the time the contract was drafted. *Id.*

25.     In this case, there is no dispute that a valid and enforceable contract exists between the parties, nor is there a dispute that Plaintiff performed its contractual obligations, namely, that it provided Defendant with public relations and marketing services pursuant to the Agreement. The threshold issue is whether the monthly advance provided for in the Agreement (the "Advance Provision") is a cap on fees for core public and media relations services performed by Plaintiff. If the monthly advance is a cap, then Plaintiff is not entitled to fees in excess of the advance that were incurred in performing base or core services which were not pre-approved by Defendant. If the monthly advance is not a cap, then Plaintiff is entitled to fees incurred in performing base or core services above the advance. The Court finds that the advance is not a cap.

26.     The language of the Agreement and the course of conduct of the parties both support the conclusion that the monthly advance is not a cap on core public and media

relations services. The language of the Agreement is unambiguous, and the parties mere disagreement on the meaning of terms does not render the terms ambiguous. *Dean Mgmt, Inc. v. TBS Constr., Inc.*, 790 N.E.2d 934, 939 (Ill. App. Ct. 2003). The Advance Provision states that the monthly advance is an "advance towards funding the base media relations program." This Court must give these words their plain meaning, unless they are defined in the contract. *Id.* The contract does not define these terms. The plain meaning of the language, "advance towards," is clear. The language means that the monthly advance is in partial fulfillment of the final amount to be paid to Plaintiff at a later date for the work performed on the base media relations program. Pursuant to the Agreement, the balance of the fees for base media relations program work done beyond the advance are to be invoiced at the end of each month. Px 13, p. 7. There is no mention that this balance must be approved prior to the work being performed, as is the case for other types of work provided for under the Agreement. Looking at the contract as a whole, the base media relations program as laid out in pages two and three of the Agreement contemplates ongoing work to enhance the image and reputation of MB. Such work includes generating media lists, preparing news releases, writing source letters, doing media training, and monitoring the media for success. There is no pre-approval requirement on this work. This lack of restriction does not mean, however, that MB gave ITQ a blank check to do base media services work for MB. MB had the right to object to invoices submitted by ITQ within seven

days and ITQ certainly was aware, even if the specifics were unkown, that MB had a budget within which to operate.

27.     The Agreement provides that pre-approval is required for another type of work, designated as "project work" in the Agreement ("Project Work Provision"). The first sentence of Paragraph Four, which is underlined for emphasis, requires pre-approval from MB before any "project work" in excess of the monthly advance is performed. Px 13, p. 7. This work was to be invoiced separately from base media services, and included assignments different than those covered by the base or core services. These assignments, such as extended writing assignments or crisis communications, are more extensive or more urgent than the base or core services. Additionally, projects must be initiated with set parameters, budgeted, and agreed upon before the services are provided. Px 13, p. 6. There is an exception for "as needed" consulting services, but the fact that those are in addition to the monthly advance invoice or pre-approved projects must be pre-disclosed. *Id.*

28.     Thus, under the Agreement, the parties intended three categories of work to be performed: (1) base or core media or public relations services, which need no approval; (2) project work, which require approval to the extent that it is not covered by the advance; and (3) "as needed" consulting services, which must be pre-disclosed to the extent it is not covered by the advance. The parties also contemplated that the advance could be applied to any one of these categories, until the advance was extinguished. For instance, so long as both base services and "as needed" services could be performed for less than the advance, then

13

ITQ was not required to obtain pre-approval or to pre-disclose the work; but if the base services already had extinguished the advance, then pre-disclosure of the "as needed" services would be required. Thus, the advance was not a cap on the fees for any of these services, except to the extent that ITQ failed to obtain pre-approval for "project work" or to pre-disclose "as needed" consulting services. If ITQ failed to take those steps, then it would not be entitled to fees for that work above the advance. However, no such requirement exists for base media services.

29. The course of dealing between the parties supports the Court's interpretation of the Agreement. Because the accounting records of both MB and ITQ are confusing, the Court primarily must focus on the behavior and testimony of the actors in this case.

30. At all times relevant to this dispute, Raymond Minkus billed his time at either $250 or $295 per hour; the time for Stephanie Hamernik, who initially worked for ITQ Minkus & Dunne part-time in mid-2000 as an Account Executive and was promoted to Senior Account Executive in late 2000 to assist in the "development of marketing strategies, preparation and presentation of client communication and the management of internal resources in the execution of projects," Px 40, was billed at either $105 or $140 per hour. Dx 14, at 12.

31. MB paid the full invoice amount for all of the work performed by ITQ through November, 2001. Those amounts include fees for both base services and project work. Pl. Exs. 14, 15-18. The amounts allocated to the base services alone were well beyond the

14

advance each month. *See, e.g.*, Pl. Ex. 14 ($11,082.50 in fees charged for base or core media or public relations services). Thus, the course of dealing indicates that the advance was not a cap on charges for base or core media or public relations services.

32.     Furthermore, the fact that Minkus reduced his staff's hourly rates in 2002 does not support the finding of a cap because it is illogical for him to charge less per hour in order to be able to squeeze more hours under a cap, especially when the cap went up that year. Moreover, there is no need for hourly rates for any work done under a cap. If ITQ could expect no more than $7,000 per month for any work done, then as far as MB is concerned the hourly rates of ITQ employees are of no consequence.

33.     Defendant, however, posits that the amounts allocated to base services over the advance were attributable to a secret budget created within the marketing budget to protect the confidentiality of several mergers and acquisitions in which MB was involved. Specifically, Perlman instructed Minkus to record his time spent on confidential special projects under base service categories. Only later would the special project work fees be segregated out of the base service fees. The Court has several problems with this position.

34.     First, the foundations for this position rest solely upon the testimony of Perlman and Minkus. However, they lack credibility on the issue. They both are biased against Plaintiff. Perlman has terminated her relationship with Plaintiff and has continued to use Minkus's new company. Minkus has no interest in biting the hand that feeds him. MB, through Perlman, is his company's largest client. Additionally, Minkus and Plaintiff

are locked in related litigation against each other. Therefore, the Court views their testimony with skepticism. Indeed, both were impeached during trial on a number of significant issues.

35. Second, the invoices do not indicate a shift in methodology. Perlman testified that the reason all of the 2001 invoices were paid was because they all represented base services performed at a rate of $5,000 per month and any additional fees were for confidential project work, even though on the face of the invoices the work was for both base services and non-confidential project work. The 2002 invoices, she argues, were not paid in full because the fees were for non-confidential project work and for base services in excess of the monthly $7,000 advance. She paid only the amount of the advance plus the amount allocated to special projects. She also testified that the base or core service fees were never less than the advance. One problem with this testimony is that there is no difference between the 2001 and the 2002 invoices on their faces. *Compare, e.g.*, Px 8 *with* Px 14. The significance of this situation is that it requires the Court to believe that ITQ suddenly changed its invoicing practice and began invoicing base or core service fees beyond the monthly advance in 2002, which it did not do in 2001 even though it was permitted to under the Agreement. The other problem with this testimony is that there is no evidence of subsequent fee reallocation in 2001 due to confidentiality. In fact, Minkus did not keep a second set of records for the purpose of reallocating confidential fees. The only fee reallocation in 2002 was not due to confidentiality but rather misallocation. Moreover, Minkus contemplated that the charges for the base media services would exceed the monthly advance. Perlman

16

recognized that base or core media or public relations services could exceed the advance and acted accordingly by paying the fees in full.

36.    What is clear is that in 2000 and 2001, Perlman readily paid in full the invoice amounts from ITQ, and she remained under budget. In 2002, her situation changed, and when her budget became strained she began to refuse to pay the full invoice amounts from ITQ. In an effort to obtain as much payment as possible without affecting Perlman's marketing budget, Minkus reallocated as many fees as he could from base media services work, which were paid out of the marketing budget, to special projects, which were paid out of a separate budget. Nonetheless, the advance is not a cap on fees for base media services.

37.    Because the monthly advance is not a cap and none of the base media services in excess of the monthly advance need to be approved, the Court finds that Defendant breached the Agreement.

38.    The Court will now explore the reasonableness of the fees charged to Defendant. Plaintiff has the burden of proving that the charges were reasonable. *Victory Mem'l Hosp. v. Rice*, 493 N.E.2d 117, 119 (Ill. App. Ct. 1984). There are four categories that must be addressed: (1) fees charged for base or core media or public relations work; (2) fees charged for the Bloch project;(3) fees charged for the Media Kit; and (4) fees charged for work performed after the termination of the Agreement.

### 1. Fees Charged for Base or Core Media or Public Relations Work

39.    Defendant objects to the fees charged by Plaintiff for base or core media or public relations work. It challenges both the time and the rates charged by ITQ for performing such work. This challenge fails, and the Court finds both the time expended and the rates charged to be reasonable. Plaintiff maintained time records for its employees. Px. 31-38. The work performed was similar to that in 2000 and 2001.

40.    While working for ITQ, Ray Minkus initially billed MB at an hourly rate of $295; Stephanie Hamernik's time initially was billed at an hourly rate of $140. MB never objected to these rates when it paid them in 2000 and 2001. *See Berthold Types Ltd. v. Adobe Sys. Inc.*, 186 F. Supp. 2d 834, 839 (N.D. Ill. 2002) (finding payment of bills to be evidence that rates are reasonable).

41.    In 2002, these rates were dropped to $250 and $105 respectively. However, in 2003, after Perlman's budget crisis, Minkus raised his hourly rate back to $295. Hamernik was no longer working for ITQ. The Court finds the rates to be reasonable. The Court will now examine the charges made for the specific services to which MB objects.

### 2. Fees Charged for the Ralph Bloch Project

42.    For a one-day event, ITQ invoiced MB four times for a total of $23,686.25. Px 5-7, 24. Ralph Bloch, of Raymond James, was in Chicago for a wealth management seminar for MB. ITQ was involved in promoting media exposure for that seminar by having Bloch appear on radio and television interviews. It is clear that the attempts were not as

18

successful as the parties would have liked, as Bloch only appeared once on WBBM radio and on a small local Chicago television station. MB refuses to pay for the Bloch project because it is not satisfied with the results and it claims that the fees are excessive. In fact, on June 25, 2002, Karen Perlman sent to Stephanie Hamernik an email stating: "What is the value of [Bloch being on WBBM Radio] to [MB?] Ralph Bloch may not even mention us. We are spending dollars of your time possibly working on something that will bring us no visibility." Dx 13. Nonetheless, MB paid ITQ $10,643.75 for this work after it first received an invoice showing fees for the Bloch project. Px 24, 27.

43.     Plaintiff now requests $13,042.50 in additional work, but has put forth no evidence that the amount it seeks for this work is reasonable and customary. Moreover, there is no explanation as to why MB was invoiced three more times for the same work. Therefore, the Court finds that ITQ is not entitled to recover any additional fees for work performed on the Bloch Project.

### 3.     Fees Charged for the Media Kit

44.     MB objects to the fees charged by ITQ for work performed on preparing the Media Kit for MB. The Court finds that Perlman did authorize the work performed on the Media Kit, but other projects were given priority. Perlman terminated the Agreement with ITQ before ITQ could complete the Media Kit. Under the circumstances, ITQ should be compensated for the work it performed in furtherance of an authorized project. MB owes ITQ the full sum of the fees for the work performed on the Media Kit prior to December 18,

2002. Those fees are included in the invoices discussed below in section III.C of this opinion.

### 4. Fees Charged after the Termination of the Agreement

45. MB objects to the fees charged by ITQ for the work performed in gathering and boxing MB's files after the Agreement had been terminated. The Court finds that ITQ is not entitled to these fees, as such work customarily is not charged to a former client.

### 5. Amounts Due and Owing Under the Invoices

46. There are ten invoices in dispute under Plaintiff's breach of contract claim. The Court finds that some or all of each of those invoice amounts are due and owing. The Court will discuss the details of each invoice below, but first makes the following observations. All of the disputed service invoices, except invoice No. 02121672, have applied a $7,000.00 advance to the amount due for each invoice. All disputed invoices were sent to the attention of Karen Perlman. Many of these invoices were sent several months after the last work date being invoiced. All of the disputed service invoices, except invoice No. 02121672, include fees for both "project work" and for base or core media or public relations services. Invoice No. 02121672 contains fees only for base media services. The amounts actually paid by MB above the $7,000.00 advance were for "project work" only. MB failed to pay ITQ for the base media services performed and invoiced above the $7,000.00 advance. Finally, MB failed to pay ITQ for those out of pocket expenses shown in the disputed invoices, to which ITQ is entitled under the Agreement, but for ease of this

discussion the Court has lumped them into the category of base or core media or public relations services.

### a. Invoice No. 2689

47.    ITQ sent invoice No. 2689 dated January 2, 2002 for its February 2002 advance in the amount of $5,000.00.  Px 1.  MB has not paid that invoice.  The Court finds that, pursuant to the Agreement, MB owes ITQ the amount of $5,000.00 to satisfy this invoice.

### b. Invoice No. 02040659

48.    ITQ sent invoice No. 02040659 dated May 15, 2002 in the amount of $12,884.88 to the attention of Karen Perlman for work performed from March 30 to April 26, 2002.  Px 3.  The April advance amount of $7,000.00 was deducted from the total, leaving a balance due of $5,884.88.  The invoice was sent on January 28, 2003 in preliminary format because ITQ could not locate a copy of the original final invoice.  Dx 11.  There was some speculation at trial that the invoice may not have been sent in 2002, but a September 11, 2002 memorandum from Raymond Minkus to Karen Perlman demonstrates that the invoice was received prior to September because the memorandum references an April invoice.  Px 25 (9/11/02 Memorandum from Minkus to Perlman).  The Court finds that because the invoice was received by MB and it contains fees for only base or core media or public relations services, ITQ is entitled to full payment of the invoice.  Therefore, MB owes ITQ $5,884.88 on this invoice.

c.   **Invoice No. 2740**

49.   ITQ sent invoice No. 2740 dated June 6, 2002 for its July 2002 advance in the amount of $7,000.00. Px 4. MB has not paid this invoice. The Court finds that, pursuant to the Agreement, MB owes ITQ $7,000.00 on this invoice.

d.   **Invoice No. 02060784**

50.   ITQ sent invoice No. 02060784 dated July 29, 2002 in the amount of $25,522.33 to the attention of Karen Perlman for work performed from May 26 to June 28, 2002, including work on the "Bloch Financial Presentation" in the amount of $9,680.00. Px 5. The $7,000.00 June advance was applied against the total for a remaining balance of $18,522.33. MB has not paid this amount. For the reasons stated above, the Court finds that MB does not owe ITQ the fee charged for the Bloch Project. MB, however, owes ITQ the remaining balance of $8,842.33 on this invoice for work performed on base or core media or public relations services.

e.   **Invoice No. 02071247**

51.   ITQ sent invoice No. 02071247 dated August 20, 2002 in the amount of $26,258.00 to the attention of Karen Perlman for work performed from June 29 to July 26, 2002, including fees for "Lincolnwood" in the amount of $2,137.00, "LaSalle Systems Leasing" in the amount of $11,579.00, "Bloch/Wealth Management" in the amount of $1,330.00, and "Media Kit (Post Merger)" in the amount of $4,090.00. The $7,000.00 July advance was applied against the total for a remaining balance of $19,258.00. Px 6. Of that

22

amount, MB paid $13,716.00. Px 30. That amount represents payment for "Lincolnwood" and for "LaSalle Systems Leasing" (special projects), which were approved on February 6, 2003 by Karen Perlman. Dx 17. As previously determined, MB does not owe ITQ the fees for work performed on the Bloch Project. MB, however, does owe ITQ the fee invoiced for the work performed on the Media Kit. The remaining balance represents fees for work performed on base or core media or public relations services, to which ITQ is entitled. Therefore, MB owes ITQ $4,212.00 on this invoice.

**f.     Invoice No. 02080549**

52.     ITQ sent invoice No. 02080549 dated September 3, 2002 in the amount of $24,907.35 to the attention of Karen Perlman for work performed from August 2 to August 30, 2002, including "Lincolnwood" in the amount of $1,530.00, "LaSalle Systems Leasing" in the amount of $5,745.00, "Bloch/Wealth Management" in the amount of $2,032.50, and "Media Kit (Post Merger)" in the amount of $4,737.50. Px 7. The $7,000.00 July advance was applied erroneously to the total amount because the advance already had been applied to invoice No. 02071247, but nonetheless left a remaining balance of $17,907.35. Of that amount, MB paid $4,177.50. Px 30. As previously discussed, ITQ is not entitled to additional payment for the Bloch Project. However, MB must pay ITQ for the work performed on the base or core media or public relations services indicated in the invoice, as well as for the Media Kit. Moreover, the amount paid is less than the amount of

23

"special project" fees shown on the face of the invoice. Therefore, MB owes ITQ $11,697.35 on this invoice.

### g. Invoice No. 02100807

53. ITQ sent invoice No. 02100807 dated November 21, 2002 in the amount of $25,919.75 to the attention of Karen Perlman for work performed from August 31 to September 27, 2002, including "ID/Naming Communications" in the amount of $4,625.00, "Lincolnwood Merger" in the amount of $1,250.00, and "Conversion PR" in the amount of $1,000.00. Px 8. The November advance of $7,000.00 was applied to the total, for a remaining balance of $18,919.75. Of that amount, MB paid $6,875.00. Px 30. The amount paid represents the charges for the South Holland projects (listed as "ID/Naming Communications"), for the Lincolnwood Merger, and for the Conversion PR. Dx 19. The Court finds that MB owes ITQ the remaining balance of $12,044.75 on this invoice for work performed on base or core media or public relations services.

### h. Invoice No. 02100813

54. ITQ sent invoice No. 02100813 (which duplicates the unpaid invoice No. 02110652) dated December 10, 2002, in the amount of $24,984.86 to the attention of Karen Perlman for work performed from September 27 to October 25, 2002, including "Real Estate Finance" in the amount of $5,500.00, "ID/Naming Communications" in the amount of $4,375.00, and "Lincolnwood Merger" in the amount of $3,000.00. Px 9-10. The November advance of $7,000.00 was applied erroneously to the total amount because the advance

already had been applied to invoice No. 02100807, but nonetheless left a remaining balance of $17,984.86. Of that amount, MB paid $15,114.50. Px 30. That payment, pursuant to Karen Perlman's February 6, 2003 authorization, is allocated to work performed on the "MB Real Estate Finance" issue, on South Holland, and on "Lincolnwood." Dx. 20. On the invoice, Perlman made handwritten changes to the categories (for example, she changed "ID/Naming Communications" to "South Holland") and reallocated several thousand dollars in fees to the three categories. *Id.* However, she claimed $6,727.50 in authorized base media services, which is $272.50 less than the $7,000.00 advance, but did not request a refund under the advance. *Id.* The Court finds that MB owes ITQ the remaining $2,870.36 on this invoice for work performed on base or core media or public relations services.

### i.    **Invoice No. 02110647**

55.    ITQ sent invoice No. 02110647 dated December 10, 2002 in the amount of $24,992.85 to the attention of Karen Perlman for work performed from November 1 to November 29, 2002, including "ID/Naming Communications," in the amount of $250.00, and "South Suburban Trans," in the amount of $5,180.00. Px 11. The $7,000.00 November monthly advance once again was applied erroneously to the total because the advance already had been applied to invoice No. 02100807, but nonetheless left a remaining balance of $17,992.85. Of that amount, MB paid $8,055.00. Px 30. That amount was paid pursuant to Karen Perlman's February 6, 2003 approval and allocated to "Lincolnwood" (renamed from "ID/Naming Communications") and to "South Holland" (renamed from "South

25

Suburban Trans"), after fees were reallocated from other categories. Dx 21. The Court finds that MB owes ITQ the remaining $9,937.85 on this invoice for work performed on base or core media or public relations services

### j. Invoice No. 02121672

56.    ITQ sent invoice No. 02121672 dated January 13, 2003 in the amount of $8558.30 to the attention of both Alan Kotlin, who remains unidentified, and Karen Perlman for work performed from November 30 to December 27, 2002. Px 12. No monthly advance was applied to the total balance. This invoice was not paid and includes fees for base or core media or public relations services only. As previously discussed, ITQ is not entitled to fees for the work performed after the termination of the Agreement on December 18, 2002. Therefore, MB owes ITQ the fees for the time worked by Stephanie Hamernik and Raymond Minkus, the only employees who worked on the account at that time, from November 30, 2002 to December 18, 2002. During that time, Hamernik worked thirty-eight hours on the MB account (coded on time sheets as 50128). Px 32 (Time Sheets for Stephanie Hamernik dated 11/29/02, 12/6/02, and 12/13/02). ITQ should be reimbursed for Hamernik's work at her hourly rate of $105, totaling $3,990.00 in fees. Raymond Minkus worked ten hours on the MB account. Px 31 (Time Sheet for Raymond Minkus dated 12/6/02). ITQ should be reimbursed for Minkus's work at his hourly rate of $250, totaling $2,500.00 in fees. Thus, the Court finds that MB owes ITQ the total amount of $6,490.00 for this invoice.

57.	Therefore, the Court concludes that MB owes ITQ the sum total of $73,979.52 on the outstanding invoices involved in the breach of contract claim.

## C.	ACCOUNT STATED CLAIM

58.	An "account stated" determines the amount of a preexisting debt when parties who previously have conducted monetary transactions agree that there truly is an account representing the transactions between them and one party renders a statement of account to another who retains that statement beyond a reasonable amount of time without objection. *Best Buy Co., Inc. v. Harlem-Irving Cos., Inc.*, 51 F. Supp. 2d 889, 899-900 (N.D. Ill. 1999). The retention of the statement of account for an unreasonable amount of time without objection constitutes an acknowledgment and recognition by the latter of the correctness of the account. *Motive Parts Co. of Am., Inc. v. Robinson*, 369 N.E.2d 119, 122 (Ill. App. Ct. 1977). What constitutes a reasonable amount of time within which to make an objection depends upon the circumstances of the case, the ordinary course of business, and the relationship of the parties. *Chi. & E. Ill. R.R. v. Martin Bros. Container & Timber Prods. Corp.*, 408 N.E.2d 1031, 1036 (Ill. App. Ct. 1980).

59.	This claim focuses on invoices numbered 2689, 02040659, 2740, 02060784, 02071247, 02080549, 02100807, 02100813, 02110647, and 02121672, Px 1, 3-8, 10-12, because they are accounts representing the transaction between the parties. This claim does not focus on invoice number 020040583A, Px 2, as that invoice is the subject of Plaintiff's unjust enrichment claim, which is discussed in section III.D of this opinion.

60.     Because Plaintiff's invoices often were sent months after the work was performed and Plaintiff had no reason for further delay, the Court accepts the fact that the invoices in question were sent to Defendant on or about the date of the invoice, except for invoice number 02040659 dated May 15, 2002, which clearly was sent in January 2003. Some concern arises with regard to whether Defendant timely objected to the invoices.

61.     Under the terms of the Agreement, MB must object within seven days of receiving an invoice. In an answer to an interrogatory, however, MB stated that it objected to invoices within thirty days. Px 42, at 2. At trial, Perlman testified that the objections came within seven days of receiving the invoices.

62.     No one from ITQ knows when Perlman objected to the invoices. The parties' course of dealing demonstrates that they did not insist upon strict compliance with the invoicing procedure set forth in the Agreement. Plaintiff did not always issue its invoices timely, and Defendant did not always object timely. The fact that Minkus attempted to resolve any disputes Perlman had with the invoices in August 2002 demonstrates that ITQ acknowledged Perlman's right to object, no matter when the objection was made. *See Maher & Assocs., Inc. v. Quality Cabinets*, 640 N.E.2d 1000, 1007 (Ill. App. Ct. 1994) ("Whether the terms of a written contract are modified by acts or conduct is a question for the trier of fact."). However, the Court finds that no objections were made to, nor were objections permissible under the Agreement for, invoices numbered 2689 and 2740 for the $5,000.00 and $7,000.00 monthly advances. Therefore, the Court finds that MB owes ITQ the amount

of $12,000.00 for accounts stated. This amount, however, already has been included in the breach of contract award and is not in addition to that award.

## D. UNJUST ENRICHMENT CLAIM

63. A trial court has a duty to restore parties to their rights. *Yugoslav-American Cultural Ctr., Inc. v. Parkway Bank & Trust Co.*, 763 N.E.2d 360, 367 (Ill. App. Ct. 2001). Thus, recovery under the theory of unjust enrichment occurs when a defendant voluntarily has accepted a benefit that would be inequitable for it to retain without payment since the law implies a promise to pay compensation when the value of the services are knowingly accepted. *Id.*

64. Plaintiff alleges that Defendant unjustly retained, to Plaintiff's detriment, the benefit of valuable services rendered by Plaintiff without payment and that the retention of that benefit without payment violates fundamental principles of justice, equity, and good conscience. This claim stems from work done by ITQ on MB's 2001 Annual Report.

65. MB retained Grady Campbell, Inc. to prepare and publish MB's 2001 Annual Report. At Perlman's suggestion, Grady Campbell, Inc. in turn subcontracted ITQ to write the copy for that Annual Report. ITQ performed the work and invoiced to Grady Campbell, Inc. the aggregate sum of $9,882.50 for the work. Dx 23, at 3-4. Grady Campbell, Inc. paid that sum to ITQ by a check dated July 15, 2002. Dx 14, at 7. On May 8, 2002, prior to receiving that check, ITQ sent invoice No. 020040583A to the attention of "Don Campbell @ Grady Campbell, Inc on Behalf of MB Financial" for professional fees and expenses

related to work done on the Annual Report from February 23, 2002 through March 29, 2002. Px 2. Invoice No. 02040583, which Plaintiff has called a "companion invoice," in the amount of $13,588.63 was sent to the attention of Karen Perlman on the same day and invoiced work performed during the same period, but it does not include fees for work performed in connection with the Annual Report. Px 20. Defendant paid $6,588.63 of invoice No. 02040583, after the $7,000.00 advance was applied, but Grady Campbell, Inc. did not pay invoice No. 020040583A. Plaintiff now claims that the $21,066.25 balance of invoice 020040583A is due and owing from Defendant.

66.    Plaintiff argues that Defendant has been unjustly enriched by retaining without payment the value of the services Plaintiff rendered to Defendant through the work done on the 2001 Annual Report. This claim is without merit. Plaintiff's work on Defendant's Annual Report was at the behest of Grady Campbell, Inc., which subcontracted Plaintiff to perform services for it. Moreover, Grady Campbell, Inc. paid Plaintiff $9,882.50 for the work performed.

67.    Regardless whether Defendant retained the benefits from the services provided by Plaintiff, it is not inequitable for Defendant to retain the benefit without payment because Plaintiff had no contract with Defendant to perform these services and was paid by Grady Campbell, Inc. Any further dispute regarding this issue is between Plaintiff and Grady Campbell, Inc. Therefore, Defendant in this case can not be held accountable for work performed for it indirectly, especially when Defendant had paid a third party for these

30

services. *See Indus. Lift Truck Serv. Corp. v. Mitsubishi Int'l Corp.*, 432 N.E.2d 999, 1002 (Ill. App. Ct. 1982).

## E.   INTEREST

68.     Plaintiff is entitled to statutory interest on the amount of damages awarded in this case pursuant to the Illinois Interest Act. 815 ILCS 205/2 provides:

> § 2. Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance; on money received to the use of another and retained without the owner's knowledge; and on money withheld by an unreasonable and vexatious delay of payment. In the absence of an agreement between the creditor and debtor governing interest charges, upon 30 days' written notice to the debtor, an assignee or agent of the creditor may charge and collect interest as provided in this Section on behalf of a creditor.

Under Illinois law, statutory interest can be recovered at the discretion of the court. *Bank of Chi. v. Park Nat'l Bank*, 660 N.E.2d 19 (Ill. App. Ct. 1995). The statute is applied on "instruments of writing," such as invoices. *Sherwin-Williams Co. v. Mark Charcoal Co., Inc.*, No. 80 C 4541, 1985 WL 3932, at *6 (N.D. Ill. Nov. 15, 1985). The creditor must, however, prove that the money due was a liquidated amount or subject to easy computation. *Ameritech Info. Sys., Inc. v. Bar Code Res.*, 331 F.3d 571, 575 (7th Cir. 2003).

69.     In this case, the damages are what this Court has awarded on Plaintiff's breach of contract and account stated claims. Those damages were easily computable because they were set forth through invoiced fees based upon amount of hours worked multiplied by

31

hourly rates. Plaintiff, therefore, is awarded statutory interest at an annual rate of 5%. For the sake of simplicity, the Court finds that the interest will have begun to run thirty days from the date of the last invoice ITQ sent to MB, dated January 13, 2003. Thus, MB owes ITQ interest from February 13, 2003 to May 6, 2004 in the amount of $4,538.54.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff ITQ Lata, LLC, is entitled to damages from Defendant MB Financial Bank, N.A., for breach of contract and account stated in the total amount of $73,979.52, which represents amounts due and owing on the following invoices, plus interest in the amount of $4,538.34:

| | |
|---|---|
| Invoice No. 2689 | $5,000.00 |
| Invoice No. 02040659 | $5,884.88 |
| Invoice No. 2740 | $7,000.00 |
| Invoice No. 02060784 | $8,842.33 |
| Invoice No. 02071247 | $4,212.00 |
| Invoice No. 02080549 | $11,697.35 |
| Invoice No. 02100807 | $12,044.75 |
| Invoice No. 02100813 | $2,870.36 |
| Invoice No. 02110647 | $9,937.85 |
| Invoice No. 0212672 | $6,490.00 |
| Invoice No. 020040583A | $0.00 |
| | |
| Interest | $4,538.34 |
| | |
| Total | $78,517.86 |

Judgment is hereby entered in favor of Plaintiff ITQ Lata, LLC, and against Defendant MB Financial Bank, N.A., in the total amount of $78,517.86 for all invoices under Count I (breach of contract) and in the total amount of $12,736.08 for two monthly advance

invoices numbered 2689 ($5,000.00) and 2740 ($7,000.00) plus interest ($736.08) under Count II (account stated) of its Amended Complaint. The judgment under Count II is not in addition to the judgment under Count I. Judgment is hereby entered in favor of Defendant MB Financial Bank, N.A., and against Plaintiff ITQ Lata, LLC, on Count III (unjust enrichment) of Plaintiff's Amended Complaint. Plaintiff, as the prevailing party, is entitled to recover its court costs against Defendant.

SO ORDERED THIS 6th DAY OF MAY, 2004.

_Morton Denlow_

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies mailed to:**

Daniel P. Hogan
MCCABE & HOGAN, P.C.
9 North Vail Avenue
Suite 102
Arlington Heights, IL 60005

Counsel for Plaintiff

Edward P. Freud
RUFF, WEIDENAAR & REIDY, LTD.
222 North LaSalle Street
Suite 1525
Chicago, IL 60601

Counsel for Defendant

# United States District Court
## Northern District of Illinois
### Eastern Division

ITS Lata, LLC

**JUDGMENT IN A CIVIL CASE**

v.

Case Number: 03 C 2738

MB Financial Bank, N.A.

☐ Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■ Decision by Court. This action came to trial before the Court. The issues have been tried and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Judgment is hereby entered in favor of Plaintiff ITQ Lata, LLC, and against Defendant MB Financial Bank, N.A. in the total amount of $78,517.86 for all invoices under Count I (breach of contract) and in the total amount of $12,736.08 for two monthly advance invoices numbered 2689 ($5,000.00) and 2740 ($7,000.00) plus interest ($736.08) under Count II (account stated) of its amended complaint. The judgment under Count II is not in addition to the judgment under Count I. Judgment is hereby entered in favor of Defendant MB Financial Bank, N.A., and against Plaintiff ITQ Lata, LLC, on Count III (unjust enrichment) of Plaintiff's amended complaint. Plaintiff, as the prevailing party, is entitled to recover its court costs against Defendant.

Michael W. Dobbins, Clerk of Court

Donna Kuempel, Deputy Clerk

Date: 5/6/2004